UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| JEFFREY LEWIS, | |
| Plaintiff, | |
| v. | CAUSE NO. 3:20cv956 DRL-SJF |
| ABBVIE F/K/A ALLERGEN, | |
| Defendant. | |

OPINION AND ORDER

Jeffrey Lewis is a former pharmaceutical sales representative for AbbVie. He sues AbbVie in an amended complaint alleging a single count of retaliation under the False Claims Act (FCA). Mr. Lewis alleges that after he raised concerns with his supervisors regarding off-label prescription of a certain drug, he faced unlawful retaliation. AbbVie filed a motion to dismiss his claim under Federal Rule of Civil Procedure 12(b)(6). The court grants the motion.

BACKGROUND

Taking Mr. Lewis's allegations as true, the following facts emerge for purposes of this motion. Mr. Lewis was employed by AbbVie as a sales representative from 2012 to 2021 [47 ¶ 12]. Vraylar is an atypical antipsychotic drug that was first approved by the Food and Drug Administration (FDA) in 2015 to treat schizophrenia and bipolar mania [*id.* ¶ 22]. The FDA later approved the drug for the treatment of depressive episodes in adults with bipolar I depression [*id.* ¶ 23].

The Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. §§ 301 *et seq.*, regulates the sales and marketing activities of pharmaceutical companies, which includes the approval of drugs for particular uses [*id.* ¶ 14]. The FDCA places limits on when pharmaceutical companies can engage in "off-label" marketing, meaning advertising a drug's use that has not been approved by the FDA [*id.* ¶ 14-15]. As a

result, according to Mr. Lewis, "it is illegal for drug manufacturers and their sales representatives to initiate unsolicited discussions with medical providers regarding off-label uses" [*id.* ¶ 14].

Further, the government ordinarily does not reimburse for costs associated with prescribing a drug for an off-label use unless the use is identified as safe and effective by one of three officially recognized drug compendia [*id.* ¶ 16]. The Anti-Kickback Act, 42 U.S.C. § 1320a-7b(b), prohibits drug manufacturers from compensating a healthcare provider for the purpose of influencing favorable prescriptions. The FCA provides a cause of action for violations of both the FDCA and the Anti-Kickback Act.

During his employment, Mr. Lewis received routine and periodic training and instructions about illegal marketing practices, FDA regulations, and the Anti-Kickback Act [47 ¶ 20]. He was reminded of the litigation risk posed by noncompliance with both federal and state regulatory schemes and made aware of previous investigations and lawsuits resulting from illegal promotion [*id.* ¶ 21].

Though Vraylar was approved to treat depressive episodes in adults with bipolar I depression, the drug was not approved to treat depression, also known as major depressive disorder (MDD) [*id.* ¶ 26]. Different treatments are used to treat MDD and depressive episodes associated with bipolar I disorder—not least because at least 75 percent of patients with MDD do not have bipolar I disorder [*id.*]. Though a patient who presents with depression may eventually be screened for bipolar disorder, this typically doesn't occur until several steps into the standardized depression treatment protocol [*id.* ¶ 27]. Atypical antipsychotics may be prescribed (in conjunction with other therapies) to treat MDD if several other treatments prove to be unsuccessful [*id.* ¶ 31]. Currently, three such atypical antipsychotics are FDA approved; Vraylar is not one approved for MDD [*id.* ¶ 31-32].

Vraylar also wasn't FDA approved to treat substance abuse [*id.* ¶ 36]. According to the amended complaint, the only study about the drug's efficacy in treating substance abuse was conducted by a member of AbbVie's speaker bureau [*id.*]. The study, based on three case reports from clinical practice,

consisted of patients suffering from bipolar I disorder in conjunction with substance abuse disorders, but not alone [*id.*].

Mr. Lewis alleges that around the time Vraylar became FDA approved to treat depressive episodes resulting from bipolar I disorder, AbbVie "shifted towards increasing sales of Vraylar by improperly positioning it as an MDD treatment and a treatment for substance abuse" [*id.* ¶ 38]. As alleged, this was carried out via unlawful internal practices like pressuring and retaliating against sales representatives, illegal marketing tactics, illegal speaker campaigns, and inducements of medical professionals [*id.* ¶ 39].

Specifically, according to the allegations, AbbVie pressured sales representatives to promote Vraylar to treat MDD and substance abuse, promoted national speaker programs to encourage providers to diagnose patients with bipolar and prescribe Vraylar, improperly utilized studies to promote the drug to treat substance abuse, offered gift cards for prescriptions, sent improper mailers, and advocated for medical providers to miscode under bipolar depression instead of MDD [*id.* ¶ 42-44, 48, 58, 66]. Sales representatives were told they were not being sufficiently aggressive in promoting the drug to prescribers [*id.* ¶ 46]. AbbVie also told their sales representatives to dissuade medical providers "from focusing on 'labels'" and coached representatives on what to say to increase off-label sales [*id.* ¶ 51-54]. At times, AbbVie told sales representatives to "not 'put anything in writing'" related to their efforts to increase sales [*id.* ¶ 59-60].

Mr. Lewis alleges that because of these acts, medical providers improperly wrote off-label prescriptions of Vraylar that were ineligible for reimbursement by government programs [*id.* ¶ 39]. He raised concerns about these tactics. During a site visit with a supervisor, Mr. Lewis questioned the propriety of bringing a particular study to the site visit; in response, his supervisor said he would deny he ever had it and that it "may just happen to fall out of his backpack" [*id.* ¶ 48]. Mr. Lewis was told to follow up with this particular client, who was in fact given a copy of the report [*id.*].

Further, Mr. Lewis alleges that on "several occasions" he reported his concerns about the illegal marketing and off-label promotion of Vraylar [*id.* ¶ 67]. He points to his training in the regulatory framework for his unwillingness to violate the law in promoting Vraylar as he was being instructed [*id.*] Mr. Lewis also "recognized that the unlawful promotion of the drug might implicate federal anti-fraud statutes" and pose a litigation risk [*id.*]. Mr. Lewis voiced his concerns regarding the marketing tactics to his direct supervisors and others, including personnel in human resources, at unspecified times [*id.* ¶ 68].

At one point, Mr. Lewis was told that he needed to "hammer" a particular provider to prescribe Vraylar to treat MDD, and, if he did not, he was told that AbbVie may send in a different representative who was "bolder" than he was [*id.* ¶ 61]. Mr. Lewis also claims that after he complained about AbbVie's tactics, he "was repeatedly targeted with unfounded accusations and increasingly negative performance feedback" [*id.* ¶ 68]. This consisted of Mr. Lewis's supervisors "continuing to punish him" for refusing to illegally promote the drug, negative performance reviews that referenced his unwillingness to promote Vraylar to treat MDD, scolding for his failure to use the speaker series as promotion, threats to use a revoked performance improvement plan against him, and the assignment of "administrative make-work" that added to his overall workload and was only required of him [*id.* ¶ 69-70, 72, 75, 76]. Mr. Lewis alleges that he repeatedly called out this mistreatment as resulting from his reporting and refusal to participate in illegal off-label sales activity [*id.* ¶ 74]. The retaliation, according to Mr. Lewis, caused "damages including the loss of promotions, salary increases, stock options, bonuses, and other incentives" [*id.* ¶ 77].

Mr. Lewis filed his original complaint in 2020 on behalf of the United States and three states pursuant to the FCA and counterpart state statutes. In that original complaint, Mr. Lewis alleged that AbbVie's promotion of Vraylar for off-label and non-medically accepted uses would cause fraudulent reimbursements. He alleged retaliation. On February 16, 2024, the United States (for itself and on behalf of the three states) filed notice that all parties declined to intervene in the matter.

4

AbbVie filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) on May 6, 2024. Subsequently, Mr. Lewis filed an amended complaint on May 28, 2024. There, Mr. Lewis alleged only a single count of retaliation under the FCA.[1] This mooted the original motion. AbbVie consequently filed a motion to dismiss the amended complaint. AbbVie argues that Mr. Lewis fails to demonstrate that he engaged in protected activity or that AbbVie was aware that he was protesting fraud, and that he has failed to plead a plausible claim for retaliation.

## STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010). A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). It need not plead "detailed factual allegations." *Id.* A claim must be plausible, not probable. *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012). Evaluating whether a claim is sufficiently plausible to survive a motion to dismiss is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) (quotations and citation omitted).

---

[1] When Mr. Lewis amended his complaint and effectively dismissed all claims brought on behalf of the United States and the three states, those four parties (pursuant to a section of the FCA that requires government consent prior to dismissal) consented to dismissal. Thus, Mr. Lewis's case is only brought on his own behalf.

5

DISCUSSION

Congress enacted the FCA to combat financial crimes committed against the United States. *See Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 792 (2000). The FCA prohibits knowingly presenting "a false or fraudulent claim for payment or approval" to the federal government and knowingly making, using, or causing to be made or used "a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B). The FCA allows for private citizens, called relators, to bring *qui tam* suits against alleged fraudsters on the United States government's behalf. 31 U.S.C. § 3730(b). The United States may, if it chooses, intervene in these suits, 31 U.S.C. § 3730(b)(2), or, if the United States declines (as was the case here), the relator may then prosecute the case on his own. 31 U.S.C. § 3730(c)(3).

An "off-label" prescription is one written for a purpose that has not been approved by the FDA. *United States v. King-Vassel*, 728 F.3d 707, 709 (7th Cir. 2013). Once a drug has been approved for one use, though, the FDA cannot prevent physicians from prescribing the drug for other uses, and off-label prescriptions are quite common. *Id.* Regardless of whether a physician may prescribe a drug for an off-label use, government programs (such as Medicaid) generally will not pay for medications prescribed for purposes not approved by the FDA or "supported" by a recognized compendium. *Id.* at 710.

The FCA recognizes a retaliation claim. An employee is entitled to relief if he "is discharged, demoted, suspended, threatened, harassed, or in any manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee … in furtherance of an action under this section or other efforts to stop [one] or more violations of [the FCA]." 31 U.S.C. § 3730(h). A plaintiff ultimately must prove that (1) he was engaged in protected conduct, (2) the employer knew of the employee's protected conduct, and (3) the employee faced the adverse employment action because of that protected conduct. *United States ex rel. Uhlig v. Fluor Corp.*, 839 F.3d 628, 635 (7th Cir. 2016) (citations omitted). To determine whether an employee's conduct was protected, the court looks to

whether "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." *Id.*

A claim under § 3730(h) need not be pleaded with specificity, *see* Fed. R. Civ. P. 9(b), as it alleges retaliation rather than fraud, *United States ex rel. Sibley v. Univ. of Chi. Med. Ctr.*, 44 F.4th 646, 661-62 (7th Cir. 2022). At the motion to dismiss stage, a plaintiff meets his burden so long as he alleges "some specific facts to support the legal claims asserted in the complaint." *Id.* at 662 (citation omitted). In other words, he must plead a facially plausible claim. *See Iqbal*, 556 U.S. at 678.

The amended complaint fails to plead a plausible FCA retaliation claim. Though it certainly pleads that AbbVie engaged in aggressive tactics to position Vraylar for off-label use in treating both MDD and substance abuse to increase the company's sales (with specific alleged instances of this), and that Mr. Lewis reported his concerns about the drug's so-called illegal marketing and off-label promotion, nothing plausibly links this to fraud against the government. The amended complaint just alleges that Mr. Lewis complained of the off-label promotional campaign—something he was not willing to participate in doing.

Mr. Lewis pleads that he "recognized" this unlawful promotion "might implicate" federal anti-fraud statutes [47 ¶ 67], but he never alleges that this occurred or cites any instances of this occurring, much less that he complained that his employer was engaged in committing fraud against the government by submitting a false claim for payment or by making a false statement in aid of such a claim for payment. *See* 31 U.S.C. § 3729(a)(1)(A)-(B). Nothing plausibly pleads that a reasonable employee in his shoes would believe that his employer was committing fraud against the government. Whatever concerns he had about AbbVie's marketing approach and its effect on physicians or off-label prescriptions, he was not engaged in protected activity under the FCA by complaining about the company's marketing alone—not when there was no attendant fraud by his employer against the government, or any reasonable belief that his employer was so engaged in fraud against the government. *See Sibley*, 44 F.4th at 665 (affirming dismissal of retaliation claim when one employee failed to allege how her complaints had anything to do with

fraudulent claims submitted to the government); *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 917 (6th Cir. 2017) (calling the alleged chain between a plan to get doctors to prescribe off-label drug use with an eventual submission of false claims to the government "unusually attenuated").

Merely objecting to promotions or marketing that might lead someday to someone's violation of the FCA through the submission of a false claim is insufficient. *See United States ex rel. Wilkerson v. Allergan Ltd.*, 2024 U.S. Dist. LEXIS 51312, 78 (N.D. Ill. Mar. 22, 2024) ("knowing that certain conduct that may be occurring can lead to FCA liability does not mean that [plaintiff] acted in furtherance of an FCA action"); *see also United States ex rel. Grant v. Thorek Hosp. & Med. Ctr.*, 2008 U.S. Dist. LEXIS 34133, 6 (N.D. Ill. Apr. 25, 2008) (plaintiff failed to plead sufficient facts to show she was engaged in protected activity when she had no knowledge of any false claim submitted to the government); *United States ex rel. Kennedy v. Aventis Pharms., Inc.*, 512 F. Supp.2d 1158, 1168-69 (N.D. Ill. 2007) ("Though [plaintiff] may have complained about off-label marketing, there is no indication in her complaint that she informed her employers that she suspected that [the employer] was defrauding the government or that she was pursuing or assisting in making an FCA claim."); *cf. Ling v. Pharm. Alts., LLC*, 2022 U.S. Dist. LEXIS 1437, 8-11 (D. Kan. Jan. 4, 2022) (complaining of state licensing issue was not protected activity when there was no link to fraudulent activity against the government).[2]

In response to AbbVie's motion to dismiss, Mr. Lewis attaches an exhibit. The court is typically confined to the pleading. Though a "complaint may not be amended by the briefs in an opposition to a motion to dismiss," *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 348 (7th Cir. 2012), the court may consider "additional facts" in a brief opposing dismissal "so long as those facts are consistent with the pleadings," *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019-20 (7th Cir. 2013) (citation omitted); *see, e.g., Jones v. Sparta Cmnty. Hosp.*, 716 F. Appx. 547, 547 (7th Cir. 2018). Even so, this exhibit doesn't redeem the amended complaint. The portions cited by Mr. Lewis hew closely once more to the

---

[2] Two cases were decided before the 2009 amendment to the FCA, but they remain persuasive for today's purposes.

allegation that he communicated to AbbVie concerns about potential regulatory violations with its marketing and promotion (and COVID-19 related concerns), not fraud committed against the government [*see* 55 PDF 3; 55-1 PDF 4-5, 49, 59, 63, 70, 74].

From here, Mr. Lewis asks (only in his brief) for another opportunity to amend his complaint. He says there is "substantial documentation" of his allegations against AbbVie, but he refers specifically only to his written disclosure that was first docketed in November 2020 and then was subsequently attached to his response. AbbVie asks the court to dismiss the case with prejudice because he already has had an opportunity to amend but has been unable to allege a plausible claim. AbbVie notes that the amended complaint was filed after its first motion to dismiss.

Leave to amend should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). The court may deny leave to amend when there is undue delay, bad faith, dilatory motive, undue prejudice to the opposing party, or when the amendment would be futile. *Bethany Phamacal Co. v. QVC, Inc.*, 241 F.3d 854, 860-61 (7th Cir. 2001). Several reasons counsel against granting leave to amend. First, Mr. Lewis already had and exercised the opportunity to amend once. Second, he was well aware of AbbVie's challenge to his FCA retaliation claim because the company filed a prior motion to dismiss the original complaint with today's same argument, so he reasonably filed his amended complaint with an eye toward developing any plausible basis for such a claim. In short, he had a meaningful shot. Third, Mr. Lewis articulates no specific facts he wishes to plead now that were not available beforehand or that somehow would augment what he has already alleged. That is no small matter when he was rather replete in alleging the nature of his communications about AbbVie's marketing, but indefensibly anemic in alleging any fraud against the government. If he had it, he would have alleged it by now. On this record, another attempt to amend would prove futile and wasteful. The court thus denies a second chance to amend the pleading to address this same issue.

9

CONCLUSION

Accordingly, the court GRANTS AbbVie's motion to dismiss [51] and DISMISSES the case with prejudice.

SO ORDERED.

October 22, 2024                             *s/ Damon R. Leichty*
                                             Judge, United States District Court